Good morning, Council. Our next case, United States v. Sears, number 20-1016, and we will start with Mr. Romano. May it please the Court, John Romano of the United States. I'd like to reserve three minutes for rebuttal. Granted. Thank you very much. By suppressing evidence, the District Court here committed legal error. The defendant ignored police commands to stop, paused briefly to curse at the officers and shield his side from view, and then fled. Those four seconds of pause did not equal submission in any realistic sense to the officer's show of authority. That was a legal error. The District Court came to the conclusion that a reasonable person would not have been under the impression they were free to go. Do you quibble with that conclusion? We did. We, I think, conceded that below, that by racing out of the car and saying police stopped, that that was a show of authority. The problem is that the second prong requires a manifest compliance with those orders. And here we have the defendant walked away. It's not until he got to the door that he turns around. I'll clean this up for all our listeners at home. He said, I ain't doing S, leave me the F alone. He turned his side away from the flashlight and then he ran. And I, you know, we think it's three, four, maybe five seconds at most. And under this court's precedence, and this court really has been a leader in this area, that's not sufficient. Counsel, why isn't this even more meaningful compliance than we had in Brown? There we said it was enough, not just that he were placing his hands on the vehicle, but simply moving to place hands on the vehicle and not completing the action. The command was to stop. And, and Sears did, according to the district court's findings, he, which it sounds like you're not disputing, he stopped, he turned around, he attempted to engage in conversation with the detectives. He then turned to the side, again, not fleeing, but turning, even if seeking to conceal one side. Why isn't that far more compliance with the instruction than there was in Brown? Well, in Brown, the court, I think, pointed out that the defendant complied with orders not to move. He followed their directions, he then faced the car, he then started to put his hands on the vehicle. This, this to me seems a lot closer to what happened in Valentine, where we have a In Valentine, he then gives his name, and then he flees. Here, I mean, the idea that this was an attempted conversation, I mean, he threatened, essentially, the officers, he was moving, basically, in that entire four second period. I mean, there's no period where he's actually standing still, maybe with his hands up or giving his name. He's cursing at them, he's shifting, he's moving, and then he's off. Okay, but Mr. Romano, there's more going on. He was going to go into his building, his home, he could have fled into his home, they couldn't get him without a warrant there. He doesn't, he stops as they're running towards him, he lets them get closer to him. So isn't that different and significant? And none of the other cases involved, you know, being on the edge of your home, involved being right by a police car or something like that. Really, Your Honor, I suppose that's true. There's no real evidence of why he didn't go into that but again, we have to look at the totality of circumstances here. He has ignored the officers for several seconds. He turns around for a period, again, of maybe four seconds at most, at which point he curses at them. It's not a cooperative discussion. I mean, Judge Martini himself said it was a confrontation at the door. He shifts his side away, which the officers also find completely suspicious, and then he's off in an attempt to get away. I don't know if there's any case similar to that where this court or any other court has found that that's enough to be a realistic submission to authority. I mean, the word submit means to yield, to, you know, to yield to one's governance or authority. If anyone else submitted to someone like that, I mean, that's, no one would ever think, gee, you've submitted to my authority by cursing me out, turning away from me and then running away all in a matter of four seconds. Counsel, the district judge here made findings, and I take it in your briefing, you don't dispute those findings, and you don't make arguments about the application of whether we should be reviewing for clear error, for example. So we can accept those findings of the district court as true as we move forward with our Fourth Amendment analysis, correct? Yes, I mean, for the most part, I think, Your Honor, that the court accepted what the officer said. For the most part, I think, Your Honor, that the court accepted what the defendant said, but the court accepted that that's what he said. And then from the video, we could see what happened. So there's not a lot of findings that I think are in dispute here, really. Towards the back of the view... But the court's findings include that he elected not to enter the building, that he stopped, that he turned around, and that he attempted to converse with the detectives. Well, Your Honor, I mean, I think that that's a characterization that's, I mean, not... I mean, again, I'm not taking... I think that's a characterization more than a factual finding. We know what he said, that the district court credited that what he said to the officers was, I ain't doing this, leave me the eff alone. I don't know that that's... that the idea that that's a attempted conversation as a factual finding, so much as a characterization of what happened. I mean, well, he credited the officers that that's what he said. What about the judge closes his opinion by saying, a reasonable officer standing in the shoes of the detectives could not have made the purported observations or relied upon these observations. Those are factual determinations, aren't they? Yeah, Your Honor, that... Okay, so what I was about to say was at the end of the opinion, there's something that might be a factual dispute. But that has nothing at all to do with the first issue here, which is, did he submit at the door? I don't think there's any real factual disputes there. Again, perhaps, you know, whether he reached the door or didn't reach the door. Again, from the video, there's no evidence at all whether he reached for the door or not. So, I mean, we didn't take exception with what Judge Martini found, but there's no evidence whatsoever that he put that he just decided not to touch the door. But again, I don't know. Why isn't the finding that he attempted to engage in conversation, a fact finding as to Sears' intent in speaking with the officers? Whatever words he chose to use, why isn't that the district court making a finding as to what he was seeking to do at that point? Well, first of all, I think it's completely objective analysis. So I don't know that Sears' intent matters at all in this. And second, there's no evidence at all where that could even come from. I mean, Judge Martini tells us what the defendant said, and there's nothing contrary to that. I mean, he doesn't say that Sears attempted to say something else. Sears himself put in an affidavit where he doesn't say anything about what he said. So the only evidence is what Judge Martini said, I ain't doing us leaving the F alone, and then he runs. So again, there's other cases where there's far more constructive conversation than this. And the court has said, that's not enough, especially in a situation where, again, it's a very short period of time and then flight. You know, Valentine, he gives his name and there's some Ninth Circuit cases where there's actual discussion back and forth. And the court says, no, that's not good enough. And they rely on Valentine. Again, this court is sort of a leader in this area. What about nearly stopping, the act of stopping? Again, that's Valentine right on point and Smith. And some of the other cases, I pointed to some non-presidential opinions of this court, where again, there's similar stopping. Stopping alone is not going to be good enough. And again, you can distinguish this case from the others. Judge Restrepo, I know you were on the Hester opinion, and I actually argued that case. And that's a case where the defendant was sitting in a car for an extended period of time before the officers actually get to the door, they have a conversation with the driver. And what you said in that opinion was at the time he fled, he had long since submitted. No one could possibly say that about the defendant here. It's only four seconds total. There's no period at which he had long since submitted like in Hester or some of the other cases. What is a long enough for submission? Again, it's a totality of the circumstances. So I think it's going to matter case by case. Maybe if here, again, I'm not going to weigh in on exactly how he would come out here, but what if here he had his hands up the whole time and he said, well, my name is, you know, I'm in Sears. I'm sorry, I'm stopping. Maybe then it's a closer call. Maybe if we change the facts a little bit and he's at the door the entire time and the officers get out of the car, run towards him, and he's standing there the whole time and he puts his hands up, well, then maybe it's a different situation. So I think, again, it's a factual, you have to look at the totality of the circumstances. And again, looking at everything together, is it enough? Can you really say someone has yielded to authority when they ignore you, turn around, curse at you, shield their side, and run away in a matter of four seconds? What's our standard of review here? And what do you make of our statement in Clark that we must draw all reasonable inferences in the prevailing party's favor, in the defendant's favor? Well, the standard of review here is de novo. I mean, there's no deference whatsoever owed to the district court's finding. And the court made that very clear and low. The moment of the seizure and whether there's reasonable suspicion are reviewed de novo. I don't... The facts that support them, you agree that we should be taking all inferences there in favor of here, Mr. Sears? Well, again, it's clear a review of the facts, but I don't know that there's any particular disputes, especially on this point, as to what the facts are. Well, what about what the judge concluded with, and he kind of pinned his analysis of reasonable suspicion on his conclusion that he didn't believe the police officers? Well, okay, so we can jump to the second point, which is if this court were to find that he submitted at the door, then you would get to the reasonable suspicion at the door. If the court agrees with the government that there was no submission at the door, then I think everyone agrees that once he flees, there's reasonable suspicion to stop him at that point. But if we go back to the door, look, I think Judge Martini's opinion is a little confusing. There's sort of three sections to the opinion. The first section talks about whether he submitted to authority. The second section, he does an entire analysis where he accepts all of the officer's testimony. And even there, he says, nope, not good enough. We disagree with that point. The third part of the opinion is that one page where, to me, is very unclear. I think it seems to be he's talking only about the waistband movement. He talks about the movement and the subtlety of the movement and says that it would be an unreliable observation. He never says, I don't believe the officers are telling the truth. He doesn't say, I don't think the officers saw something. And in fact, I think that would be hard to reconcile with what the judge says on that page of the opinion. But he does say that the detectives could not have made the purported observations. So he's saying that there's no way they could have seen what they testified they saw. Well, Your Honor, first of all, he doesn't come out and say, I think the officer lied up on the video. That's number one. Number two, he also says the video is inconclusive as to whether he even made the movement. So it's a little strange for him to say, you know, I can't tell on the video whether he made the movement or not, but there's no way the officer possibly could have. Well, but no, no, no, no, no. He could be more charitable, which is the officers think they saw something, but there's nothing reliable they would have seen. They're mistaken, it's dark, it's in the distance. He's reviewed the video. I mean, the fact that he's more charitable, the officers doesn't mean that that's not a reasonable factual finding to which we're going to defer. Yes, Your Honor, but if the officers are merely mistaken, then that should still be counted in the reasonable suspicion analysis. I mean, and that's Kansas v. Glover and, you know, Hine, the other. Well, if they're unreasonably mistaken, no. Well, Your Honor, I think it would be very hard to say they were unreasonably mistaken here when, number one, Judge Martini never found that the video didn't show the movement. So that's a number two, you could actually see on the video that he does make a movement where he pulls out a cigarette. So he's making movements with his arms. If the officers were mistaken about what he was doing, he grabbed a cigarette instead of touching his waist or reaching for a gun, that doesn't, I think that still qualifies in the reasonable suspicion analysis. Particularly given that the officers didn't observe him taking out the cigarette, when Judge Martini is making those observations, I mean, isn't he going as far as he can without creating giglio material to say that he has real concerns about the officer's ability to accurately perceive what they were testifying? Was this critical movement? Your Honor, I think it's a very charitable way of reading the judge's opinion. The three paragraphs are, as we said in the brief, not crystal clear. Judge Martini said that Delaval was a candid witness. Judge Martini said the video shows almost everything that Delaval testified to. Now remember, the incident report came before the video. The video shows the defendant turn around. The video shows him look back over his shoulder. It shows him picking up his pace. It shows all the things that Delaval said would be there. And yes, can you see the movement to the waistband? It's almost impossible to see clearly on this video. Delaval says, I could see more clearly at the time than this video would show, which wouldn't be hard because the video is very unclear. And again, I think that this page of the opinion is a little hard to figure out what he's talking about. Now, I would say, Your Honor, that even without that movement, there is sufficient reasonable suspicion here. This court talked about... Counselor, why don't we leave that on rebuttal unless my colleagues have other questions right now as we've exceeded time. Thank you, Your Honor. Okay. And I hope I pronounced your name correctly, Ms. Aboji Ajiman? Yes, that's it, Aboji Ajiman. Good morning, Your Honors. My name is Anita Aboji Ajiman, and I represent Appellee Iman Sears. Your Honors, the district court's decision here was spot on and correct. Mr. Sears submitted to the police authority. When the police got out of the car and yelled at him, police stop, and he did. The government has been talking about the case as though we don't have a video surveillance footage here. And certainly the video surveillance footage is not as clear as it could be. But what happened at the hearing was that Detective DeLaval testified while the video was being played. And so the court sort of got to review them in tandem. And so we encouraged the court to do the same here, to go back and review the video. And the video shows that when Iman Sears heard the police, it's unclear initially whether he heard them or he thought they were talking to him because DeLaval testifies that there were people milling about in the court yet at the time. So it's certainly possible that he may have thought they were speaking to some of them. But certainly when it became clear that the police were yelling, police stop at him, he stopped. As Judge Martini found, he didn't make a move to get into this building, which Judge Bebas already noted. He turned to the officers and he engaged in some colorful language with them. That's a euphemistic way of saying he's swearing at them. And swearing is normally inconsistent with submitting to authority. People who submit to the police tend to act respectfully towards them. Sometimes, yes, that's correct, Your Honor. But other times people, perhaps someone like Mr. Sears decides to go with his First Amendment or to say whatever he wants in that moment, which was the curse at the police. Of course, we're not disputing that. But what is clear is that when he stopped, when he did what he was asked to do, which was to stop. Now the government talks about Valentine and how what happened here is even less than what happened in Valentine. But I draw the court's attention to the facts of Valentine. In Valentine, he was specifically asked to raise his hand and he didn't do that. What he did instead was to answer some questions that were not compliant with the specific order given. And I think the courts, this sort of is a theme through the court's opinions, like in Brown, in Smith, in Waterman, where the defendants have done something opposite to what they were specifically asked to do. And the court has said that is not compliant or submission. Okay, so that's a fair point. But Valentine, the backbone of Valentine seems to be, you know, it has to be more than momentary. Just taking a pause, and he stopped, he paused, that wasn't enough. Here, we got a video, we can time it. Mr. Romano came up with I mean, it seems odd. And of that four and a half seconds, for some portion of it, he's cursing at them or turning away from them. So how does that fit with the momentary test? Your Honor, the momentary test, first of all, was suggested by the defendant in Valentine, that his momentary compliance was enough. But the court said that that wasn't so. But here, this is not merely momentary. He stops. Now when we hear four seconds, it sounds really short. But in the Second Circuit has said that while length may be an important factor, what is what matters also is the nature of the interaction between the police and the individual. And here, the nature of the interaction, as you watch the video shows, Mr. Sears fully stopped, as Detective Laval flashed a light on him in an attempt to search the area in his waistband. He held out his hand sort of showing that there was nothing in his hands while he cursed at them before. And all that happened before he later on fled. Now, the fact that he fled later, as Judge Martini said, does not vitiate his initial compliance with the show of authority, which was police stop, which he did. The government seems to say that Mr. Sears should have done more, that he should have engaged in conversation with them. But that's not what happened here. The specific show of authority in this instant case was police stop, not police stop, tell me your name, where are you going? What are you doing? No, it was brief police stop. And Mr. Sears did that. He stopped and complied with the order. But if we adopt a rule that says, okay, you just got to comply with whatever they order, then it's going to depend on the specifics. If the order is stay there for five minutes, then a four minute stop won't count as compliance. It can't be pegged to just, did you do the specifics of what they said? And as you said, in Valentine, if you like, answer a question or two, that doesn't necessarily make it a seizure. So it has to be more than just, did you comply? What makes this compliance more meaningful than the Valentine or the Smith situation? I think what makes this compliance more meaningful is what we can see on the video. And I'm not sure if they had that in Valentine or in Smith or in Smith. In this case, we have the tangible evidence of a video where the court can see for itself what is actually happening. And that's what judge Martini did. He looked at the video and saw what was happening. And he didn't just look at the time. In fact, judge Martini cited to Mendel Hall and said, you can determine whether there's been a submission to authority based on the number of officers that have surrounded the defendant, whether or not one of those officers showed a weapon or whether the tone that the officers used. Here, if you look at the video, which we have the benefit of, you see detective De La Val and his partner, detective Rivera, move on very quickly onto Mr. Sears. You see them standing in front of him. You see De La Val attempt to flash his light on him. And so we have a little bit more, it's sort of a video, is a picture shows a thousand words. The video here certainly gives the court more of a feel for the nature of the circumstance that shows that it was more than momentary compliance. There was something else going on here. And the court has to look at all those factors together in making the determination whether or not Sears submitted to the authority of the courts here. And we can certainly, and our position is that if you look at the video and you consider that with De La Val's testimony, what it shows is that Iman Sears did comply with the police show of authority to stop. And he did. And he could have entered his building as judge Bibas mentioned earlier on, but he didn't do that. He turned around to face the officers and to talk with them. You say that what we can see in the video shows that submission. We have cases like Waterman where there has been evasive action in response to police instructions. We've said that's not sufficient. And here, even on the video, why don't we just see a series of evasive steps? He's moving away from them. He's when he turns around, he's cursing at them, keeping them at a distance. He then turns up to the side and then flees. Where is there actually a momentary pause in the action in any of that? The momentary pause in the action, Your Honor, is as you see Sears coming towards the building, he gets the building. The video shows that he doesn't, in their incident report, the police wrote that he opened the door, but wasn't able to get in and which is when he stopped. But the video shows something different. The video shows that he gets the door, he stops, turns to face the officers and then says, I'm not doing anything. Leave me alone. And that, Your Honor, there is the stop. That he was perhaps maybe in a corner doesn't really matter. We're looking at the nature of the interaction here. And the nature of the interaction is certainly more than the momentary compliance that the government sort of has been talking about. He does more than that here. He actually stops. And going back to your question about Waterman, in Waterman, I think another thing that's really important and Fourth Amendment analysis is by its nature fact intensive. And we have to look at the facts of all the different cases. And in Waterman, what happened was the defendant was sitting on a porch and was asked with four other people and was asked to show his hand. His hand were in a hoodie and he didn't do that. Instead, what he did was he attempted to open the door and the court found that sort of failure to acquiesce to the individual's, to the officer's orders was a failure to comply. And in Lowe, which was decided in 2015 and which Judge Krause was on the panel, the court talked about passive acquiescence also being something that can show a submission to compliance. And here we have more than passive acquiescence. We actually have the defendant stopping, turning and talking to the police officers that shows that he did more than what was in Valentine or more than what was in Waterman or more than what was in Smith. He was instead more like the defendant in Brown, which Judge Krause brought up when talking, when having the discussion with Mr. Romano earlier on, that in Brown, the defendant even moved to put his hands on the car. What he did was he attempted to before leaving. Whereas here, we don't have that. Sears fully stopped, said something to the officers that it may not have been as long as Mr. Romano or the government would want. It certainly doesn't mean that he didn't comply. And looking at the nature of the circumstances shows that he did comply and was seized. If we accept that and we're looking at what level of suspicion the officers had at that moment at the door, why isn't the totality of circumstances here? Once we add in, even if it was a mistake, the officer's perception of a waistband adjustment that in their training experience was consistent with someone carrying a firearm, why doesn't that tip us over the edge when it comes to the other factors that, you know, granted late night, high crime area, perhaps standing alone would not be sufficient. But with that, if we defer to their training experience, why wouldn't that tip the scales? This, the waistband movement that De La Val repeatedly insists upon, and that's why the court mentions it multiple times, because De La Val insists that it happens, wouldn't tip it over, because De La Val admits that he doesn't see the outline of a weapon. And Judge Martini and his findings noted that furtive movements, this court has said, alone are not sufficient. And oftentimes when there is some sort of furtive movement, there is something else happening there. For example, Judge Martini cited to, if I believe the name of the case is, the name of the cases are Waller and Foccaretta, where he talks about furtive movements and trying to move to the waistband while the person is in front of the police officer, so there's more that they can see. Whereas here, Detective De La Val testified that he saw this alleged furtive movement from 25 feet away, approximately. It was 1143 at night. His clear line of view was about maybe a second or one, a second or two, because he was driving east in the westbound lane. He naturally had to keep his eye on the road. There was a big white van. And if the court watches the video, the court will see this. There was a white van. And so this furtive movement, even if he may have saw something, certainly wasn't, and the court noted, there was nothing in the video that supported that. But in any event, the court looked at De La Val and said an officer in De La Val, with De La Val's experience, certainly wouldn't have believed that having some sort of waistband movement at a high crime area in the middle of the night in a neighborhood that Mrs. Sears lives in, and the officers noted his address in the incident report as 839 Frelinghuysen Avenue, was insufficient. And the court is right. This court will only disturb the court's factual findings for clear error. And if the court reviews the video and looks at the testimony as it does so, there certainly wasn't clear error in this instance. De La Val admitted that there were obstructions in his way, in addition to the cars that we've talked about earlier. There were some benches that block his view. There were some light posts, some trees in the area. And so his line of view was not very clear. And so he- But what about the realm of Hine, of simply good faith and stake? Well, that's not sufficient, Your Honor. He may have been, he may have believed that he saw that, but the test is totality of the circumstances, and whether a reasonable officer, given all the looking at the furtive movement in isolation, we sort of have to look at them together. And the court has never said one movement weighs more than the other. The court has never said furtive movement alone weighs more than being a high crime area. You sort of have to look at all of them together. And looking at all of them together, Judge Martini correctly determined that no reasonable officer, a reasonable officer in De La Val's position, driving at night in those criminal activity was afoot. In fact, one of the things that De La Val talks about is that when Sears saw the car, he turned and he seemed nervous, but he was 25 feet away. And so he admitted that he couldn't see Sears shaking or sweating, which are often signs of the nervous system sort of going into fight or flight mode. Another thing that De La Val talked about was that Sears quickened his pace when he saw them, which the district court also considered. And when you watch the video, Sears sort of seems to be sauntering away, casually lighting a cigarette while he does that. And in fact, De La Val insists after he's shown the video multiple times and keeps saying, you look here, look here, look here. He claims that his eyesight from 25 feet away was certainly better than the video, but the video doesn't support his assertion that there was a quick, subtle adjustment. The video only shows that Mr. Sears took out a cigarette, which may have been the movement that he saw, but it's inconclusive otherwise. But looking at all these factors together, the evidence from the video, which the government introduced, De La Val's testimony, it's clear that the officer simply did not have reasonable suspicion to believe that criminal activity was afoot and that Judge Martini's findings were not clearly erroneous, such that the court should affirm his decision. But counsel, if we're looking at the record to determine whether the fact finding was or was not clearly erroneous and whether it supports the conclusions reached, what do we make of the fact that, as Mr. Romano pointed out, there is not an adverse credibility finding here? And so if we take the officer's testimony as a given, do you agree that with the officer's account, including what he says he saw, what he says he perceived, and what he says based on his training experience, was a gesture to a gun on the waist, that there would be reasonable suspicion? Well, Your Honor, I think Judge Pippa said it, that Judge Martini was being charitable, and that's correct. But Judge Martini looked at all of those. He credited the officer's testimony and still determined that a reasonable officer in his position would not have determined that there was criminal activity afoot. And I think we believe that that legal finding is correct. De La Val could have believed that he saw what he saw. His belief could have been mistaken. But either way, the court's finding is that even if an officer, even if De La Val saw what he said he saw, a reasonable officer in his position, given all his training and experience, would not have believed that criminal activity is afoot. And so, yes, you can accept that De La Val believed that he saw that, but his conclusion from that is incorrect. And that's what the court did here. Yes, he believed that he saw that, but that did not give him, looking at the totality of circumstances and all the factors involved, including the obstructed view, including that it was late at night, all of that, all of that together simply did not give him reasonable suspicion to believe that criminal activity was afoot. And there's nothing, and of course, the government disagrees with Judge Martini's legal conclusions that he had no reasonable suspicion, but there's nothing clearly erroneous about Judge Martini's legal conclusions and factual determinations, and that's a high burden for the government to clear, which it simply has not done in this instance. Unless there are no further questions, we rest on our briefs. Thank you. Thank you. And Mr. Romano, you have your rebuttal time. Okay, let me start at the end there. The question of whether there was reasonable suspicion is a legal question. So Judge Martini's finding is given no deference whatsoever on that question. And here, as I was about to say, this court has pointed out to four factors that support reasonable suspicion. It did it both in Brown and in Hester. The factors being, the court often looked at in the totality, whether it's a high crime area, this was one of the highest crime areas in the city, whether it was late at night, this was at 11.44 PM, whether there was nervous evasive behavior. Here, the defendant turned around upon seeing the officers, looked over his shoulder several times, picked up the pace, refused to listen to the officer's commands. And whether the defendant behaves in a way that in the officer's experience is indicative of crime. Here, waistband movement, which the officer said is something that people often do when they're holding a gun in their waistband. So all four of those factors are satisfied. So yes, I think there is reasonable suspicion under the totality of the circumstances. And we don't have to defer to Judge Martini's conclusion on that point. I'd like to go back to the first point really fast, too. My adversary says, well, he stopped. Well, sure. I mean, would this court find that someone who's walking away from the officers stops for a second, turns around and says, you know, F you, and then keeps walking, that that's good enough because he stopped? I mean, you have to stop in a meaningful sense. As the court in Valentine said, it has to be submission in a realistic sense of that word. A defendant who stops for four seconds, curses at the officers, and then runs has not stopped in any meaningful sense of the word. And again, the word stopped doesn't have some sort of significance. Valentine stopped. So did many of the other defendants we talk about in our brief. And then finally, nature of the interaction. I mean, you can watch the video and you marry that with what Judge Martini said that the defendant said, which is, I ain't doing this, leave me the F alone. The nature of the interaction is not helpful to the defendant at all. It's not cooperative. It's not, you know, working with the officers. It's confrontational. There's nothing about this nature of the interaction that makes these four seconds somehow really a submission in any realistic sense of the word. Why isn't it simply a way of protesting innocence? You know, perhaps not the most artfully phrased, but protesting innocence and attempting to talk his way out of the situation without moving forward to a pat down. Well, you know, if the defendant did not want to work, it wasn't until the officers then continued to move physically towards him for a pat down that he actually fled. Well, again, Your Honor, I don't even know if that, Judge Martini says they're going for a pat down. He's showing a flashlight. The defendant sort of turns away and then runs. But again, if the defendant had stood there and cursed to high heaven for a couple of minutes, and then, you know, they finally did the pat down, then obviously there would be a seizure. If the defendant had stood there for several minutes and then ran away, maybe then there would be a seizure. This was four seconds of time, which was completely taken up by cursing, turning away. And as I think Judge Krause, as you said, there's no period in time here where he's actually just standing there. He's turning, he's shifting his hands, he's yelling, he's moving his side, and then boom, he's off. It probably took me a lot more time to say that than it actually took to happen. So again, Your Honor, we don't think that he submitted to authority. We think that's basis alone to reverse. And if this court has no questions, we would ask the court to reverse the suppression order. Okay. Thank you both, counsel, for an excellent argument. And we will take the case under advisement.